**Mark SHINDLE, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–1070.**

Court of Appeals of Alaska.

Jan. 16, 1987.

As Amended on Denial of Rehearing Feb. 4, 1987.

John M. Murtagh, Anchorage, for appellant.

James V. Gould, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Harold M. Brown, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

After a non-jury trial before Superior Court Judge Karl Johnstone, Mark Shindle was convicted of one count of misconduct involving a controlled substance in the fourth degree (possession of cocaine), and three counts of misconduct involving a controlled substance in the third degree (sale or possession for sale of cocaine). He appeals, contending that the trial court erred in failing to suppress certain evidence, because the police failed to record statements that Shindle made following his arrest. Shindle also contends that there was insufficient evidence to sustain his conviction on one of the charges. We affirm.

Shindle was arrested at the Big Timber Motel in Anchorage after an investigation by the Metropolitan Drug Enforcement Unit (Metro) revealed that a room at the motel was being used for distribution of cocaine. Shindle's arrest was recorded by his arresting officer. After being arrested, Shindle was held at the motel while Metro officers completed their on-the-scene investigation. Approximately fifty minutes after being arrested, while still at the motel, Shindle executed a written waiver of his fourth amendment rights, authorizing Metro officers to conduct warrantless searches of Shindle's house and of his pickup truck. After consenting to the searches, Shindle gave a statement describing his involvement in the cocaine distribution scheme. Shindle's statement was recorded. However, during the fifty-minute interval between Shindle's arrest and his statement, no recordings were made. Thus, conversations between Shindle and the police dealing with Shindle's execution of the fourth amendment waivers were not recorded.

Prior to trial, Shindle moved to suppress his statement, as well as evidence seized from his truck and his house. In an affidavit, Shindle claimed that his consent to the searches was not voluntary. According to Shindle, Metro officers improperly induced him to waive his fourth amendment rights by threatening to forfeit his truck and to arrest his girlfriend if he refused. Shindle also claimed that his only reason for giving the police a statement was that he had already consented to searches that he knew would yield incriminating evidence: "Once I signed the consent papers, I felt I might as well make a statement since they [the police] were getting the evidence."

Following an evidentiary hearing, the superior court denied Shindle's motion to suppress. The court relied on the testimony of Shindle's arresting officers, who denied making any threats. According to the officers, before executing the waivers, Shindle asked if his truck would be forfeited after it was searched and if his girlfriend would be arrested when his house was searched. In response to these inquiries, the officers assured Shindle that, if he consented to the searches, his truck would not be forfeited and his girlfriend would not be arrested.

Judge Johnstone's reliance on the officers' suppression hearing testimony was expressly objected to by Shindle. During the suppression hearing, the officers had acknowledged that they could have recorded all of their conversations with Shindle. Apart from the testimony of one officer that he turned off his recorder after Shindle's arrest and had "no particular reason" for not recording the ensuing conversations, no explanation was offered for the failure to record. In urging the superior court to grant his suppression motion, Shindle argued that the officers' unexplained failure to record rendered their testimony

unbelievable, requiring suppression of the challenged evidence.

This argument, reinforced by the intervening opinion in *Stephan v. State*, 711 P.2d 1156 (Alaska 1985), is renewed by Shindle on appeal.

In *Stephan*, the Alaska Supreme Court held that the due process clause of the Alaska Constitution requires police officers, when feasible, to record custodial interrogations occurring in places of detention:

> In summary, the rule that we adopt today requires that custodial interrogations in a place of detention, including the giving of the accused's *Miranda* rights, must be electronically recorded. To satisfy this due process requirement, the recording must clearly indicate that it recounts the entire interview. Thus, explanations should be given at the beginning, the end and before and after any interruptions in the recording, so that courts are not left to speculate about what took place.
>
> Since its announcement, the *Mallott* [*Mallot v. State*, 608 P.2d 737, 743 n. 5 (Alaska 1980) (stating that as part of their duty to preserve evidence, the police are obligated to record any questioning)] rule has always included a proviso, "when feasible." The failure to electronically record an entire custodial interrogation will, therefore, be considered a violation of the rule, and subject to exclusion, *only if the failure is unexcused.*

*Stephan*, 711 P.2d at 1162 (emphasis in the original). The court in *Stephan* went on to hold that violation of this rule would result in suppression. *Id.* at 1163–65.

In the present case, Shindle acknowledges that his arrest occurred before the supreme court decided *Stephan.* He nevertheless maintains that he should receive the benefit of that decision. The state vigorously opposes this argument, insisting that *Stephan* should be given effect only prospectively.

■ There may well be strong arguments for giving at least partially retrospective application to the rule adopted in

*Stephan.* See *Farleigh v. Anchorage*, 728 P.2d 637, (Alaska, 1986) (giving partially prospective application to a rule requiring the police, as a matter of due process, to preserve breath samples in DWI cases where a breathalyzer test is administered). However, in the present case, we find it unnecessary to resolve the issue of retrospectivity, because Shindle's case falls outside the *Stephan* rule in at least three respects.

The first, and perhaps the most obvious, reason Shindle's case does not qualify under the *Stephan* rule is that Shindle's waivers were executed at the scene of his arrest in the Big Timber Motel. The *Stephan* rule "applies only to custodial interrogations conducted in a place of detention, such as a police station or jail...." *Stephan* at 1165 n. 33 (emphasis omitted). Since Shindle was not in a place of detention, his case fails to comply with the literal requirements of *Stephan.*

Second, Shindle does not directly challenge the voluntariness of his confession. He argues that his fourth amendment waivers were induced by improper threats and that electronic recording would have cast light on the voluntariness of those waivers. Although Shindle seeks suppression of the statement he made to the police, this claim hinges solely on the allegation that the statement was a fruit of the coerced fourth amendment waivers. In his affidavit, Shindle merely asserts that, after consenting to warrantless searches of his house and his truck, he thought that he "might as well" make a statement.

In contrast to Shindle's situation, the focus of the *Stephan* rule is on the importance of assuring that confessions are voluntarily made. While the court in *Stephan* did not expressly limit the rule it adopted to cases involving the voluntariness of a confession, the court's discussion makes it clear that the court's primary concern was with the problem of involuntary confessions and the related fifth and sixth amendment violations:

In the absence of an accurate record, the accused may suffer an infringement upon his right to remain silent and to have counsel present during the interrogation. Also, his right to a fair trial may be violated, if an illegally obtained, and possibly false, confession is subsequently admitted.

*Stephan*, 711 P.2d at 1161. *See also id.*, at 1158 n. 5, 1160 n. 12, and 1161 n. 15.

The *Stephan* court's focus on the problem of involuntary confessions is understandable, for, unlike fourth amendment violations, violations of the fifth and sixth amendment that result in involuntary confessions directly implicate the integrity of the verdict at trial. As the *Stephan* court put it, recording in such cases is "essential to the adequate protection of the accused's right to counsel, his right against self incrimination, and, ultimately, his right to a fair trial." *Id.* at 1159–60 (footnotes omitted).

Claims based solely on alleged violations of fourth amendment rights do not call into question the accuracy of the jury's verdict. The suppression rule in fourth amendment cases is founded on considerations of policy extrinsic to the integrity of the fact finding process. *See, e.g., Moreau v. State*, 588 P.2d 275 (Alaska 1978). Thus, the due process rationale relied on in *Stephan* is not directly applicable where the only disputed issue is one relating to the violation of the defendant's fourth amendment rights.

█ A third, closely related, feature distinguishing this case from *Stephan* is the absence of police interrogation. The *Stephan* rule applies only to custodial interrogations. Although Shindle was unquestionably in custody, his fourth amendment waivers were not induced in the course of police interrogation. The waivers were not the product of an interview in which the police sought to obtain incriminatory statements from Shindle. By his own account, Shindle waived his rights because the po-

lice pressured him to consent to warrantless searches, not because they pressured him for information.[1] Absent an attempt to elicit involuntary statements, efforts by the police to obtain a fourth amendment waiver do not constitute interrogation. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 232–33, 93 S.Ct. 2041, 2050, 36 L.Ed.2d 854 (1973); *Frink v. State*, 597 P.2d 154, 169 (Alaska 1979). Accordingly, the *Stephan* requirement of custodial interrogation was not present in this case.

Assuming *Stephan* were given retrospective application, each of the three factors distinguishing Shindle from *Stephan*, if considered alone, might be insufficient to preclude application of *Stephan* to this case. When these three differences are viewed together, however, they are of sufficient magnitude to preclude relief under *Stephan*. The rule adopted in *Stephan* reflects a careful balancing of competing interests. Although the *Stephan* court acknowledged that it might be necessary to expand the rule in future cases, it made clear its view that any such expansion is to be undertaken cautiously, and only if the need for expansion is demonstrated by experience with the current rule:

> *Caveat.* We recognize that many custodial interrogations must take place in the field, where recording may not be feasible. Because of this, the rule that we announced today has limited application; it applies only to *custodial interrogations conducted in a place of detention* such as a police station or jail, where it is reasonable to assume that recording equipment is available, or can be made available with little effort. In a future case, however, we may be persuaded to extend the application of this rule, *particularly if it appears that law enforcement officials are engaging in bad faith efforts to circumvent the recording requirements set forth in this opinion.*

---

1. In fact, at oral argument, Shindle's counsel conceded that his fourth amendment waiver was not obtained during police interrogation.

*Stephan*, 711 P.2d at 1165 n. 33 (emphasis in the original).

While Shindle raises many legitimate concerns in arguing for expansion of the *Stephan* rule, we think the holding in *Stephan* makes it clear that, at this juncture, any attempt to expand the rule would be premature. We therefore conclude that the superior court did not err in denying Shindle's motion to suppress.

Shindle next contends that insufficient evidence was adduced at his trial to support his conviction on Count I. In Count I, Shindle was charged as an accomplice with the sale of cocaine. The charge was based on a transaction between a Metro undercover officer and a third person, Kemo Crosby, which occurred at the Big Timber Motel prior to Shindle's arrest. Shindle was not present at the time, and his involvement in the cocaine distribution at the motel was not yet known.

■ Although Shindle admitted that he supplied cocaine to Crosby knowing that it would eventually be resold, he argues that this evidence was not a sufficient predicate for accomplice liability. Shindle contends that, at most, the evidence shows the existence of a "wholesaler-retailer" relationship between him and Crosby. Such a relationship, according to Shindle, does not suffice to establish accomplice liability, because, as a mere "wholesaler," Shindle had no knowledge of specific transactions contemplated by Crosby, and he had no intent to assist Crosby in the particular sale charged.

In the evidentiary context of the present case, Shindle's argument is unpersuasive. Accomplice liability is governed by AS 11.-16.110, which provides, in relevant part:

Legal accountability based upon the conduct of another: complicity.

A person is legally accountable for the conduct of another constituting an offense if

. . . . .

(2) With intent to promote or facilitate the commission of the offense, the person

. . . . .

(B) aids or abets the other in planning or committing the offense. . . .

In order to establish Shindle's liability as an accomplice under this statute, it was incumbent on the state to prove, first, that Shindle was aware of Crosby's plan to resell the cocaine, and, second, that in supplying Crosby with cocaine, Shindle acted with the intent to promote Crosby's plan. *See Bowell v. State*, 728 P.2d 1220, 1222 (Alaska App., 1986). It is well settled, however, that the state was not required to show Shindle's awareness of and intent to promote the specific sale that actually occurred. As long as Shindle acted with the intent to promote resale, he could be held liable as an accomplice for any sale to Crosby that was reasonably foreseeable. *See Carman v. State*, 602 P.2d 1255 (Alaska 1979).

While evidence merely showing that Shindle was aware of Crosby's plan to resell might be insufficient to establish a specific intent to promote Crosby's plan,[2] the evidence actually presented in this case showed more than mere knowledge on Shindle's part. By Shindle's own admission, he was supplying Crosby and others with cocaine for resale. During a cocaine transaction between a Metro officer and Crosby that occurred several hours after the transaction for which Shindle was charged, Shindle called by telephone to the Big Timber Motel to ask how well Crosby's sales were progressing. A Metro undercover officer answered the call and expressed interest in another purchase. In response, Shindle later appeared at the motel with additional cocaine. Upon arrest, marked money from the initial transaction between the undercover officer and Crosby was found on Shindle's person.

In considering the sufficiency of this evidence, we must determine whether a fair-

**2.** *See, e.g., United States v. Fountain*, 768 F.2d 790, *amended on other grounds*, 777 F.2d 345 (7th Cir.1985), *cert. denied, Fountain v. United States*, —— U.S. ——, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986).

minded juror could find beyond a reasonable doubt that the state carried its burden of proving that Shindle acted with intent to promote Crosby's sale of cocaine. *Dorman v. State*, 622 P.2d 448, 453 (Alaska 1981); *Brown v. State*, 693 P.2d 324, 328 (Alaska App.1984). In making this determination, we must view the evidence and all inferences arising therefrom in the light most favorable to the state. Applying this standard, we conclude that there was sufficient evidence to allow a finding of specific intent. *See Abdulbaqui v. State*, 728 P.2d 1211, 1213–1214 (Alaska App., 1986).

The conviction is AFFIRMED.